In the Supreme Court of Georgia

Decided:   March 21, 2016

S15G1177.  GEORGIA FARM BUREAU MUTUAL INSURANCE
COMPANY v. SMITH et al.

THOMPSON, Chief Justice.

We granted a petition for certiorari to the Court of Appeals in Smith v.

Georgia Farm Bureau Mut. Ins. Co., 331 Ga. App. 780 (771 SE2d 452) (2015),

to determine whether the Court of Appeals erred in holding, as a matter of first

impression, that personal injury claims arising from lead poisoning due to lead-

based paint ingestion were not excluded from coverage pursuant to an absolute

pollution exclusion in a commercial general liability ("CGL") insurance policy

covering residential rental property.  Because we disagree with the Court of

Appeals' conclusion that lead-based paint was not clearly a "pollutant" as

defined by the policy, we reverse the Court of Appeals decision in this case.

Amy Smith ("Smith"), individually and as next friend of her daughter

Tyasia Brown ("Brown") sued her landlord, Bobby Chupp ("Chupp") for

injuries Brown allegedly sustained as the result of ingesting lead from

deteriorating lead-based paint at the house Smith rented from Chupp. The house was insured by Chupp under a CGL policy issued by Georgia Farm Bureau Mutual Insurance Company ("GFB"). After Chupp tendered Smith's claims to GFB under the provisions of the policy, GFB filed a declaratory judgment action against Smith and Chupp seeking a determination that Brown's injuries were not covered under the policy and that it had no duty to defend Chupp against Smith's claims.

GFB contended that the child's injuries were not covered because Smith, who admitted noticing that paint was chipping, flaking, and peeling in every room of the house, knowingly and unnecessarily exposed her daughter to the dangers of lead paint. Alternatively, GFB argued that even if the policy's coverage terms did apply, Brown's injuries from lead poisoning were excepted from coverage by the policy's pollution exclusion clause, thus relieving GFB of its duty to defend and indemnify Chupp in Smith's suit.

The terms of Chupp's CGL policy require GFB "to pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies," and "to defend the insured against any 'suit' seeking those damages." The policy specifies,

2

however, that GFB has no duty to defend Chupp against any claim for damages to which the insurance does not apply. The relevant provision of the "Coverages" section of Chupp's policy provides:

> This insurance applies to "bodily injury" and "property damage" only if: (1) the "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory."

An "occurrence" is defined in the policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

Correspondingly, the policy provides in its "Exclusions" section:

> This insurance does not apply to:
>
> (f) Pollution
>
> > (1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants": (a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured.

A "pollutant" is defined in the policy as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste."

Finding that a genuine issue of material fact existed as to whether Smith

knowingly exposed her daughter to the lead-based paint, the trial court nonetheless concluded that lead-based paint unambiguously fell within the policy's definition of a "pollutant," and, as a result, Brown's alleged injuries were excluded from coverage pursuant to the pollution exclusion clause.

In granting summary judgment to GFB, the trial court found this Court's decision in Reed v. Auto-Owners Ins. Co., 284 Ga. 286 (667 SE2d 90) (2008), which addressed the proper construction of an identical pollution exclusion clause in a CGL policy insuring residential rental property, was directly on point. In Reed, a residential tenant sued her landlord for carbon monoxide poisoning allegedly caused by the landlord's failure to keep the rental home's furnace in good repair. 284 Ga. at 286. Although not explicitly listed in the policy as a pollutant, this Court held that carbon monoxide gas fell within the policy's definition of a pollutant and concluded that all of the plaintiff's injuries stemming therefrom were thus excluded from coverage under the pollution exclusion. Id. at 288. Applying Reed's analytical framework to the facts of this case, the trial court concluded it was constrained to find that lead, like the carbon monoxide gas in Reed, was a contaminant which met the definition of pollutant contained in the policy.

4

Both defendants appealed and, in a combined opinion, the Court of Appeals reversed the trial court's grant of summary judgment to GFB. The Court of Appeals observed that the specific issue of whether lead-based paint should be considered a "pollutant" for the purposes of a pollution exclusion clause such as that found in Chupp's CGL policy was one of first impression in Georgia, and noted that a conflict in judicial opinions existed among other jurisdictions with respect to this question. See Smith, 331 Ga. App. at 784. Recognizing that Georgia law requires the narrow construction of exclusions from coverage in insurance policies, the Court of Appeals sided with those foreign courts holding that a pollution exclusion like the one in this case did not bar coverage for injuries arising out of the ingestion or inhalation of lead-based paint. Id. at 785. In particular, the Court of Appeals cited Sullins v. Allstate Ins. Co., 667 A2d 617, 620 (Md. Ct. App. 1995), for the proposition that a reasonable insured could have understood the pollution exclusion to exclude coverage for injuries caused by certain forms of industrial pollution, rather than the presence of leaded materials in a private residence. Agreeing with the Sullins court that, with respect to allegations of bodily injury arising from exposure to lead-based paint, the terms "contaminants" and "pollutants" used

in a CGL policy's pollution exclusion were ambiguous and should be strictly construed against the insurer, the Court of Appeals concluded that GFB failed to meet its burden in this case to prove lead-based paint was a "pollutant" as defined by the policy. See Smith, 331 Ga. App. at 785. Significantly, in reaching this conclusion, the Court of Appeals determined that this Court's decision in Reed, supra, upon which the trial court had relied, was inapposite, finding that, while a straightforward reading of the pollution exclusion in Reed compelled the conclusion that carbon monoxide gas was a pollutant, it was unclear whether identical language in the instant policy was expansive enough to unambiguously include lead, lead-based paint or paint as a pollutant. See id. at 785-786. We granted GFB's petition for certiorari and posed this question: Were the claims for personal injury resulting from lead-based paint ingestion excluded from coverage pursuant to the insurance policy's "pollution exclusion"?

GFB argues that the Court of Appeals erred in distinguishing Reed and erred in holding that if GFB intended to exclude injuries caused by lead-based paint from coverage in the policy at issue, it was required, as drafter of the document, to specifically exclude lead-based paint injuries from coverage. As

6

with any contract, in construing the terms of an insurance policy, we look first to the text of the policy itself. See Reed, 284 Ga. at 287. Words used in the policy are given their "usual and common" meaning, see OCGA §13-2-2 (2), and the policy "should be read as a layman would read it and not as it might be analyzed by an insurance expert or an attorney." State Farm Mut. Auto. Ins. Co. v. Staton, 286 Ga. 23, 25 (685 SE2d 263) (2009) (citations and quotation marks omitted). Where the contractual language is explicit and unambiguous, "the court's job is simply to apply the terms of the contract as written, regardless of whether doing so benefits the carrier or the insured." Reed, 284 Ga. at 287. See Thornton v. Georgia Farm Bureau Mut. Ins. Co., 287 Ga. 379, 382 (695 SE2d 642) (2010). This is so because Georgia law permits an insurance company to "fix the terms of its policies as it sees fit, so long as they are not contrary to law," thus companies are "free to insure against certain risks while excluding others." Payne v. Twiggs County Sch. Dist., 269 Ga. 361, 363 (496 SE2d 690) (1998); Continental Cas. Co. v. HSI Fin. Svcs., 266 Ga. 260, 262 (466 SE2d 4) (1996). However, when a policy provision is susceptible to more than one meaning, even if each meaning is logical and reasonable, the provision is ambiguous and, pursuant to OCGA §13-2-2 (5), will be construed strictly

7

against the insurer/drafter and in favor of the insured. See Hurst v. Grange Mut. Cas. Co., 266 Ga. 712, 716 (470 SE2d 659) (1996).

In this case, Chupp's CGL policy contains an absolute pollution exclusion clause which precludes recovery for bodily injury or property damage resulting from exposure to *any* pollutant. See Reed, 284 Ga. at 288 (interpreting identical language defining "pollutant" as including "matter, in any state, acting as an 'irritant or contaminant'"). Originally developed by commercial insurers in response to environmental regulations enacted by Congress in the 1960s and 1970s which exposed them to exponentially greater liability related to claims arising from mass environmental contamination, the first pollution exclusion clauses were directed specifically at environmental pollution claims. See Peace ex rel. Lerner v. Northwestern Nat. Ins. Co., 596 NW2d 429, 445 (Wis. 1999). Subsequently, in the mid-1980s, insurers revised the language of these clauses in form CGL policies to encompass non-environmental pollution claims, thus substantially broadening their application. Id. These revised provisions, commonly referred to as "absolute" pollution exclusions, among other things, extended the application of pollution exclusions beyond the natural environment to premises owned, rented or occupied by the insured, and removed the adjective

"toxic" before the word "chemicals," thus expanding the number of chemicals regarded as pollutants. Id.

Following the insurance industry's introduction of absolute pollution exclusions in CGL policies, a split developed among jurisdictions over whether to apply these exclusions to all injuries caused by pollutants or, given the historical purpose behind such clauses, to apply these exclusions only to injuries or damages caused by what is traditionally considered environmental pollution. See Racetrac Petroleum, Inc. v. Ace American Ins. Co., 841 FSupp2d 1286, 1291 (N.D. Ga. 2011). Expressly rejecting the notion that a pollution exclusion clause is limited to industrial and/or environmental harm, Georgia courts have repeatedly applied these clauses outside the context of traditional environmental pollution. See Reed, 284 Ga. at 288 (finding carbon monoxide in a rental residence unambiguously qualifies as an irritant and contaminant and thus a pollutant); American States Ins. Co. v. Zippro Const. Co., 216 Ga. App. 499, 499-501 (455 SE2d 133) (1995) (holding that asbestos released from floor tiles during a home renovation unambiguously constitutes a pollutant); Perkins Hardwood Lumber Co. v. Bituminous Cas. Corp., 190 Ga. App. 231, 232 (378 SE2d 407) (1989) (finding smoke emanating from an insured's premises to be

an "irritant or contaminant" and, thus, a pollutant). Moreover, Georgia courts have enforced absolute pollution exclusion clauses without requiring that the pollutant at issue be explicitly named in the policy. See Reed, supra. See also Truitt Oil & Gas Co. v. Ranger Ins. Co., 231 Ga. App. 89, 91 (498 SE2d 572) (1998) ("In light of the policy language and the usual significance of the words used in the policy, it was unnecessary for the policy to specifically list gasoline as a pollutant."). Thus, while the specific question of whether lead-based paint unambiguously qualifies as an excluded pollutant under an absolute pollution exclusion may be one of first impression in Georgia, the method by which Georgia courts are to interpret absolute pollution exclusion clauses was clearly established by this Court in Reed. Because our decision in Reed controls the manner in which pollution exclusions in CGL policies are to be construed by the courts of this State, the Court of Appeals erred in failing to apply this Court analysis in Reed to the facts of this case.

In construing the absolute pollution exclusion in Reed, this Court refused to adopt an approach which considered the purpose and historical evolution of pollution exclusions before looking to the plain language of the clause itself. Reed, 284 Ga. at 288. Observing that the plaintiff claimed the release of carbon

10

monoxide inside the rental house poisoned her and that the policy's definition of "pollutant" included "matter, in any state, acting as an 'irritant or contaminant,'" this Court reasoned that it "need not consult a plethora of dictionaries and statutes to conclude that [carbon monoxide was a pollutant]" to which the policy's pollution exclusion applied. Id. at 288. Moreover, we noted that a focus on extra-textual sources of interpretation led the dissenters in Reed to find ambiguity in the pollution exclusion clause where none existed. Id.

As in Reed, we find that the contractual language of Chupp's CGL policy unambiguously governs the factual scenario in this case. Accordingly, the Court of Appeals was required to simply apply the terms of the contract as written. See id at 287. In interpreting the insurance policy's provisions, the Court of Appeals had "no more right by strained construction to make the policy more beneficial by extending the coverage contracted for than they would have [had] to increase the amount of the insurance." Cotton States Mut. Ins. Co. v. Crosby, 244 Ga. 456, 457-458 (260 SE2d 860) (1979) (citations and quotation marks omitted); Perkins, supra, 190 Ga. App. at 232.

Here, Smith alleges that her daughter suffered lead poisoning and

11

permanent injury from the ingestion of lead-based paint found on the premises of the house she rented from Chupp. Under the broad definition contained in Chupp's policy, we conclude that lead present in paint unambiguously qualifies as a pollutant and that the plain language of the policy's pollution exclusion clause thus excludes Smith's claims against Chupp from coverage.[1] Accordingly, we reverse the decision of the Court of Appeals.

Judgment reversed. All the Justices concur.

---

[1]We note that the toxic effects of lead have been known for centuries. See Peace, 596 NW2d at 443, n. 18, n. 19. Moreover, both the State of Georgia and the federal government have recognized lead-poisoning as a devastating environmental health hazard to children, have specifically identified lead-based paint as a significant source of lead-poisoning, and have enacted laws establishing standards for the proper maintenance and/or abatement of lead-based paint in residential housing units. See OCGA § 31-41-2 et seq.; 42 U. S. C. § 4851-4856 (1992).