**SECOND DIVISION**
**MILLER, P. J.,**
**MERCIER and COOMER, JJ.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS
COURT. ALL FILINGS MUST BE SUBMITTED WITHIN
THE TIMES SET BY OUR COURT RULES.*

**June 15, 2020**

# In the Court of Appeals of Georgia

A20A0111. JOSEPH v. CERTAIN UNDERWRITERS AT
LLOYD'S LONDON.

A20A0112. HILL, KERTSCHER & WHARTON, LLP et al. v.
CERTAIN UNDERWRITERS AT LLOYD'S LONDON.

MERCIER, Judge.

In this dispute concerning coverage under a professional liability insurance

policy, the insureds, the law firm of Hill, Kertscher & Wharton, LLP ("HKW") and

two of its attorneys, Robert Joseph and Douglas Kertscher, appeal from the trial

court's denial of their motion for summary judgment and the grant of summary

judgment in favor of the insurer, Certain Underwriters at Lloyd's London

("Underwriters"). For the following reasons, we affirm the trial courts' denial of

summary judgment to the insureds, and we reverse the trial court's grant of summary

judgment to Underwriters.

Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. *Matjoulis v. Integon Gen. Ins. Corp.*, 226 Ga. App. 459, 459 (1) (486 SE2d 684) (1997); OCGA § 9-11-56 (c). We review the grant or denial of a motion for summary judgment de novo. *Woodcraft by MacDonald, Inc. v. Ga. Cas. & Sur. Co.*, 293 Ga. 9, 10 (743 SE2d 373) (2013).

The relevant facts are undisputed. Joseph and HKW provided legal services to Daryl Moody and his companies beginning in 2014. In January 2015, HKW represented Moody's company in a breach of contract action against Robert Miller and a limited liability company of which Miller was a 50% shareholder ("Miller's LLC"), in Fulton County Superior Court. Approximately four months later, HKW appeared on behalf of Moody and Miller's LLC, who were named as defendants in a California action initiated by Miller.[1] Miller accused HKW of having a conflict of interest, and the parties exchanged correspondence concerning the alleged conflict.

Miller later moved in both the Georgia action and the California action to have HKW, Kertscher, and a second HKW attorney disqualified from representing Moody

---

[1] In both the Georgia and California actions, other parties were named but they are not relevant to these appeals.

and his company, alleging that HKW sued Miller's LLC in one action and attempted to represent the LLC in another action, and that HKW also formerly represented Miller through Joseph. On September 25, 2015, the Fulton County Superior Court granted Miller's motion to disqualify, finding that Joseph had previously represented Miller and Miller's LLC, and that the prior representation was directly related to the claims HKW sought to pursue on behalf of Moody's company. HKW subsequently withdrew as counsel in the California case.

On November 4, 2015, Kertscher was notified that Moody's new counsel, Douglas Chandler, would be entering an appearance in the Fulton County action on behalf of Moody and that Chandler would need Moody's files. On November 5, 2015, Chandler sent a letter to Kertscher, again informing him that Moody had retained his firm, expressing displeasure that HKW had threatened litigation to collect fees and expenses allegedly owed to HKW by Moody, and requesting that HKW not "destroy or alter any documents, information or materials related to the representation provided to Mr. Moody or any company with which he is or was affiliated." Chandler also asked Kertscher to contact him if he was interested in discussing "the execution of a [statute of limitation] tolling agreement between HKW and Mr. Moody."

On January 15, 2016, HKW purchased a professional liability insurance policy from Underwriters effective January 17, 2016 to January 17, 2017. On July 26, 2016, Chandler sent another letter to Kertscher "to follow up on our claims notice letter to you dated November 5, 2015." Chandler requested that Kertscher forward Moody's files and provide the name and contact information for HKW's insurance "adjuster assigned to this matter." Kertscher forwarded this letter to Underwriters. On January 10 or 11, 2017, a few days prior to the expiration of the policy, Chandler sent another letter to Kertscher outlining Moody's claims, including claims that HKW gave improper advice and failed to raise a defense in the California action, causing Moody to suffer "personal damage." Chandler asked HKW to sign a tolling agreement that would extend the statute of limitation and threatened to immediately file suit if the tolling agreement was not signed and received by January 13. HKW forwarded this letter to Underwriters "[s]hortly after receiving it."

On April 28, 2017, Moody and three of his companies (collectively, "Moody") filed a complaint for legal malpractice and breach of fiduciary duty against HKW, Kertscher, and Joseph. HKW notified Underwriters of the complaint in May 2017 after being served, and Underwriters agreed to provide HKW with an initial defense, but reserved its right to limit or deny coverage.

4

On May 16, 2017, Underwriters filed a complaint seeking a declaratory judgment that HKW, Joseph, and Kertscher were not entitled to coverage under the policy and that it had no legal duty or liability to provide a defense or indemnify them for any judgment or settlement. Underwriters subsequently filed a motion for summary judgment, and Joseph, Kertscher, and HKW filed a joint cross-motion for summary judgment. Following a hearing, the trial court granted Underwriter's motion and denied the cross-motion. In Case No. A20A0111, Joseph appeals from the trial court's order. HKW and Kertscher appeal from the same order in Case No. A20A0112.

The trial court's ruling was based upon two grounds. The court concluded that (1) the policy does not cover the malpractice suit because the claim was made prior to the policy's effective date, and (2) the insureds had pre-policy knowledge of circumstances, acts, errors, and omissions that they could have reasonably expected to be the basis of a claim or suit.

> As with any contract, in construing the terms of an insurance policy, we look first to the text of the policy itself. Words used in the policy are given their "usual and common" meaning, see OCGA § 13-2-2 (2), and the policy should be read as a layman would read it and not as it might be analyzed by an insurance expert or an attorney. Where the contractual language is explicit and unambiguous, the court's job is

5

simply to apply the terms of the contract as written, regardless of whether doing so benefits the carrier or the insured. This is so because Georgia law permits an insurance company to fix the terms of its policies as it sees fit, so long as they are not contrary to the law, thus companies are free to insure against certain risks while excluding others. However, when a policy provision is susceptible to more than one meaning, even if each meaning is logical and reasonable, the provision is ambiguous and, pursuant to OCGA § 13-2-2 (5), will be construed strictly against the insurer/drafter and in favor of the insured.

*Georgia Farm Bureau Mut. Ins. Co. v. Smith*, 298 Ga. 716, 719 (784 SE2d 422) (2016) (citations and punctuation omitted). The relevant provisions of the policy are as follows. The policy states that it is a "claims made and reported insurance policy," and that "[c]overage is limited to liability for only those **claims** that are *first made* against the **insured** and reported to Underwriters during the **policy period**" – January 17, 2016 to January 17, 2017.[2] (Emphasis supplied.) With regard to coverage, the policy provides:

I. INSURING AGREEMENT

A. CLAIMS MADE AGAINST THE INSURED

---

[2] HKW was the named insured, and the firm's attorneys were insured under the policy "with respect to acts, errors or omissions in **Professional Services** in the law practice."

6

Underwriters agree to pay on behalf of the **Insured**, all sums which the **Insured** may be legally obligated to pay as **Damages** to others, up to the **Limit of Liability**, resulting from:

1. A **Claim** seeking **Damages** caused by a negligent act, error or omission in **Professional Services** provided by, or that should have been provided by the **Insured** or any person for whose acts an **Insured**, as a lawyer or notary public, is legally responsible;

2. A **Claim** seeking **Damages** for **Personal Injury** . . .

The **Claim** must be made against an **Insured** during the **Policy Period**. The **Claim** must be based on an **Incident** that wholly occurs on or after the **Retroactive Date**.[3] The **Insured** must provide written notification to the Underwriters of the **Claim** while this Insurance Policy is in effect.

*In addition*, Underwriters will cover **Claims** arising from **Incidents** as follows:

---

[3] The declarations page of the policy provides a retroactive date of September 23, 1999. The policy also contains a "Retroactive Date Schedule Endorsement," which provides a specific retroactive date for each lawyer. The endorsement states that "coverage is provided to the lawyers listed herein for acts, errors or omissions or personal injuries which occurred on or after the Retroactive Date shown." The retroactive date listed for Joseph is July 22, 2005, and the date listed for Kertscher is September 23, 1999. However, for purposes of our analysis, we will simply refer to the policy's 1999 retroactive date.

1. Prior **Incidents**: Underwriters will cover **Claims** arising from an **Incident** that occurred before the **Effective Date** of this Insurance Policy if the following conditions are met:

a. The **Insured** involved did not have knowledge of the **Incident** prior to the **Effective Date** of this Insurance Policy;

b. The **Insured** was not aware of any **Incident** which could reasonably be expected to be the basis for a **Claim**; and

c. The **Claim** results from an **Incident** which occurred on or after the **Retroactive Date** and is reported to Underwriters while this agreement is in effect.

2. Reported **Incidents**: Underwriters will cover **Claims** made against an **Insured** after this Insurance Policy ends, if: . . . .

(Emphasis supplied.)[4]

---

[4] The policy defines "Claim" as "a demand received by an Insured for money or services including the service of **Suit**." "Damages" is defined as "a monetary judgment or settlement which the **Insured** is legally obligated to pay for any Claim to which this insurance applies. **Damages** shall not include **Fines**, **Sanctions** or **Penalties** or any other monetary amounts that are uninsurable under any applicable law." And "Incident" is defined as "any circumstance, act, error or omission which an **Insured** could reasonably expect to be the basis of **Claim or Suit** covered by this

1. The insureds contend that the trial court erred in concluding that Moody's claim was first made prior to the policy's January 2016 effective date. Specifically, the court found that Moody first made claims on November 4 and November 5, 2015, when HKW was asked to preserve documents and materials related to its representation of Moody and suggested that HKW sign a tolling agreement. The court concluded that these communications constituted a demand for services under the policy's definition of a "claim" – "a demand received by an Insured for money or services including the service of Suit."

The policy does not define the term "services," and we have found no Georgia cases analyzing the meaning of a demand for services as a claim in a professional liability insurance policy. However, the Eleventh Circuit has analyzed a claims-made professional liability policy that defined "claim" as "the receipt by [the insured] of a demand for money or service." *Nat. Fire Ins. v. Bartolazo*, 27 F3d 518, 519 (11th Cir. 1994). In *Bartolazo*, the insured (a physician) received a letter from a former patient's attorney "requesting [the] patient's records in connection with [a] claim for medical malpractice and other relief." Id. The court concluded that the letter "merely requested [the patient's] medical records and alluded to a claim for malpractice," and

_____

Insurance Policy."

9

that it made no demand for money or services. Id. See also *Trice v. Employers Reinsurance Corp.*, 1997 U.S. App. LEXIS 19921, slip op. at 9-10 (II) (7th Cir. 1997) (unpublished) (where "claim" defined in policy as "a demand for money or service," the court concluded that "[r]equests for information -- even if they allude specifically to the possibility of a lawsuit -- do not constitute a 'demand for money or services' within the meaning of a claims-made policy"). Id. at 9-10.[5] Thus, contrary to the trial court's conclusion, the November correspondence did not constitute demands for service and therefore were not "claims" under the policy.[6] The trial court therefore

---

[5] The cases cited by the trial court are not controlling. *Simpson & Creasy, P.C. v. Continental Cas. Co.*, 2012 U.S. Dist. LEXIS 161599 (S.D. Ga. 2012), does not hold that a demand for the client's files constituted a demand for services. The trial court likely intended to cite *Simpson & Creasy, P.C. v. Continental Cas. Co.*, 453 Fed. Appx. 868 (11th Cir. 2011). But in that case, the appellate court held that a letter acknowledging a client's claim that her attorney owed her money was a claim under a professional liability policy as a demand for money. Id. at 870-871 (III). The trial court also cited *Continental Cas. Co. v. Jewell, Moser, Fletcher, & Holeman*, 2005 U.S. Dist. LEXIS 49167 (E.D. Ark. 2005), which is distinguishable from the facts here involving a request for client files. In that case, the district court held that a complaint seeking injunctive relief to require a party to produce documents and surrender all files and trust account funds was a demand for services. Id. at 5-6.

[6] The trial court also concluded that *Miller* made pre-policy related claims. Under "Limits of Liability and Deductible," the policy provides that two or more claims arising out of a single act shall be treated as a single claim, and shall be considered first made at the time of the earliest claim arising out of such act, error or omission in professional services. The court concluded that Miller made pre-policy claims in an October 2015 letter from his counsel requesting Kertscher's professional

10

erred in finding that Moody's claim was first made prior to the effective date of the policy.

2. The trial court also erred in finding no coverage as a matter of law based on the Prior Incidents clause.

(a) As an initial matter, we must address the insureds' argument that the Prior Incidents clause is ambiguous and therefore cannot be enforced. The policy first provides coverage for claims seeking damages caused by an insured's negligent act, error or omission in professional services; the claim must be made against the insured during the policy period and must be based on an incident that occurs on or after the 1999 retroactive date. The policy then provides that "in addition," the insurer will cover claims arising from "Prior Incidents," i.e., incidents that occurred before the effective date of the policy, if: (1) the insured did not have knowledge of the incident before the effective date of the policy, (2) the insured was not aware of any incident which could reasonably be expected to be the basis for a claim, and (3) the claim

---

liability insurance information and his April 2015 motion to disqualify HKW and its attorneys. However, even if Miller's letters and motion to disqualify arose out of the same act that is the basis of Moody's claim, they do not demand money or services and therefore do not meet the policy's definition of a claim, rendering the "Limits of Liability and Deductible" provision inapplicable here.

11

results from an incident which occurred on or after the retroactive date and is reported during the policy period.

The insureds argue that the language prior to "in addition" provides coverage for pre-policy incidents, while the language after "in addition" excludes such incidents. They argue further that the phrase "in addition" would lead a reasonable insured to believe that *additional* coverage is provided, "rather than a hidden policy exclusion."

While the policy could have been drafted more precisely, "[a]n insurance contract will be deemed ambiguous *only* if its terms are subject to more than one reasonable interpretation. The policy should be read as a layman would read it and not as it might be analyzed by an insurance expert or an attorney." *State Farm Mut. Ins. Co. v. Staton*, 286 Ga. 23, 25 (685 SE2d 263) (2009) (citations and punctuation omitted; emphasis supplied). Further,

> while an ambiguity is to be construed in favor of the insured, this [C]ourt may not strain the construction of the policy so as to discover an ambiguity. In other words, the rule of liberal construction of an insurance policy cannot be used to create an ambiguity where none, in fact, exists. Thus, where the language fixing the extent of liability of an insurer is unambiguous and but one reasonable construction is possible, the court must expound the contract as made.

Id. (citations and punctuation omitted). Viewing the policy as a whole and giving a reasonable and unstrained interpretation to the language before and after "in addition," we hold that the policy is not ambiguous.

The language *before* "in addition" states that the policy provides coverage for claims seeking damages and explains that such claims must, among other things, be based upon an incident that occurs on or after the 1999 retroactive date – which would include those incidents that occur before or during the policy period beginning January 2016. Considering the policy as a whole, without question it covers those claims (made and reported during the policy period) that are based upon incidents occurring during the policy period. For example, under Section V of the policy, an insured is required to report to Underwriters those incidents the insured becomes aware of during the policy period.

The language *after* "in addition" does not exclude coverage as the insureds argue, but rather explains under what circumstances the policy will cover claims for pre-policy incidents. The term "in addition" commonly means that what is to follow is additional. While the insureds assert that the term leads an insured party to believe that additional *coverage* follows, a more reasonable interpretation is that the term means an additional *explanation* follows, especially here where it follows

13

immediately after the description of claims covered and is under the same subheading, "Claims Made Against the Insured." The insureds would have us ignore the language after "in addition" as "repugnant" to coverage, but we cannot construe the policy in a manner that would render any of its provisions meaningless. See *Flynt v. Life of the South Ins. Co.*, 312 Ga. App. 430, 435-437 (1) (718 SE2d 343) (2011) ("[A]n insurance policy, like other contracts, should not be construed in a manner that would render any of its provisions meaningless or mere surplusage . . . . Courts must avoid giving the contract a construction which entirely neutralizes one provision if it is susceptible of another which gives effect to all of its provisions." (citations and punctuation omitted)). The plain language of the policy provides coverage for claims arising from pre-policy incidents (occurring after the 1999 retroactive date) if the insured had no knowledge of the incident prior to the policy's 2016 effective date and was not aware of an incident that could reasonably be expected to be the basis for a claim.

(b) Alternatively, the insureds assert that even if the policy is not ambiguous, the trial court erred in granting summary judgment to Underwriters based on what the insureds allegedly knew – and could have reasonably anticipated – prior to the January 2016 effective date. We agree. Again, the policy covers claims for incidents

14

occurring before the effective date only if the insured did not have knowledge of the incident prior to that date and was not aware of any incident which could reasonably be expected to be the basis for a claim. The trial court found that the conflict of interest allegations, the disqualification of HKW and Kertscher in the Georgia action, Miller's demand letters requesting HKW's insurance information, and Moody's request for a tolling agreement, are all pre-policy incidents that the insureds could have reasonably expected to be the basis of a claim. However, we cannot conclude as a matter of law that the insureds could have reasonably expected these incidents to be the basis of Moody's claim.

Generally, questions of reasonableness are for the jury. See, e. g., *JNJ Foundation Specialists, Inc. v. D. R. Horton Inc.*, 311 Ga. App. 269, 278 (3) (b) (717 SE2d 219) (2011) (in most cases, reasonableness of a failure to give notice is a question for the trier of fact); *Norfolk & Dedham Mut. Fire Ins. Co. v. Cumbaa*, 128 Ga. App. 196, 199 (2) (196 SE2d 167) (1972) (no error in submitting to the jury the issue of reasonableness in timing of insured's reporting of incident to insurer). In this case, we cannot find that the pre-policy letters of the conflict of interest allegations necessarily provided grounds for reasonably anticipating a malpractice claim from Moody. The pre-policy letters from Moody made no request for HKW's insurance

15

information, and Moody's suggestion of a tolling agreement between HKW and Moody arguably was based upon HKW's threat to sue Moody to collect fees and expenses. And although the insureds could have reasonably expected Miller's demand letters requesting HKW's insurance information to be the basis of a claim by *Miller*, whether they could have reasonably expected those letters to be the basis of a claim by *Moody* is not an issue for the court to decide summarily. The issue of whether the insureds could have reasonably expected that these pre-policy communications would give rise to Moody's claim should be decided by a jury. The trial court therefore erred in granting summary judgment to Underwriters on this ground. See *Rockhill Ins. Co. v. Southeastern Cheese Corp.*, 2020 U.S. Dist. LEXIS 60995, slip op. at 26 (3) (C) (1) (S.D. Ala. 2020) (only a jury can resolve whether insured reasonably expected claims under policy when it completed policy application); *Allstate Ins. Co. v. Justice*, 229 Ga. App. 137, 140 (2) (493 SE2d 532) (1997) (jury had to determine meaning of policy's "reasonably expected" language).

The trial court erred in finding that Moody's claim was first made prior to the effective date of the policy. And because issues of fact remain as to the insureds' pre-policy knowledge/reasonable expectation of the incident giving rise to Moody's claim, the trial court erred in granting summary judgment to Underwriters based upon

16

the Prior Incidents clause. Accordingly, we affirm the trial court's denial of the insureds' motion for summary judgment, and reverse the grant of summary judgment to Underwriters.

*Judgments affirmed in part and reversed in part. Miller, P. J., and Coomer, J., concur.*